## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

OCEAN CONSERVANCY )
1300 19th Street, NW, Eighth Floor )
Washington, DC 20036 )
)
ENVIRONMENTAL DEFENSE FUND )
257 Park Ave. South )
New York, NY 10010 )          Civil Action No.
)
    *Plaintiffs* )
)
    v. )
)
WILBUR L. ROSS, in his official capacity as )
Secretary of the Department of Commerce )
Department of Commerce )
1401 Constitution Avenue, NW )
Washington, D.C. 20230 )
)
NATIONAL OCEANIC AND ATMOSPHERIC )
ADMINISTRATION )
United States Department of Commerce )
Room 5128 )
1401 Constitution Avenue, NW )
Washington, D.C. 20230 )
)
NATIONAL MARINE FISHERIES SERVICE )
Department of Commerce )
Room 14555 )
1315 East-West Highway )
Silver Spring, MD 20910 )
)
    *Defendants*. )

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.    Plaintiffs Ocean Conservancy and Environmental Defense Fund on behalf of their

adversely affected members hereby challenge the unlawful decision of the National Marine

Fisheries Service ("Fisheries Service" or "Defendants") to promulgate and issue a Temporary

Rule reopening the Gulf of Mexico private angler red snapper season and extending the season

from three to 42 days, despite finding that the action will substantially exceed the annual catch

limit set for the "private recreational sector" and delay the rebuilding plan for the overfished population. 82 Fed. Reg. 27,777 (June 19, 2017).

2.     This case is the fourth recent challenge in this Court to the government's ongoing mismanagement of the red snapper fishery in the Gulf of Mexico. *See Guindon v. Pritzker*, Nos. 1:13-cv-988-BJR (D.D.C.), 1:14-cv-45-BJR (D.D.C.); *Guindon v. Ross*, No. 1:15-cv-02256-BJR (D.D.C.); *Guindon v. Pritzker*, 31 F. Supp. 3d 169 (D.D.C. 2014) (finding the government's management of the red snapper fishery unlawful); *Guindon v. Ross*, No. 1:15-cv-02256, 2017 WL 875775 (D.D.C. Mar. 3, 2017) (same).

3.     In order to prevent overfishing and allow the Gulf of Mexico red snapper (hereinafter, "red snapper") population to rebuild, the Magnuson-Stevens Fishery Conservation and Management Act ("Magnuson-Stevens Act") requires the Fisheries Service to comply with the annual catch limit and accountability measures established in the fishery management plan ("FMP") for the red snapper fishery. Yet, in the Temporary Rule, the Fisheries Service has extended the fishing season of red snapper for private anglers in a manner that conflicts with the FMP and implementing regulations.

4.     The Fisheries Service admits that the Temporary Rule will cause the "private recreational sector" of the red snapper fishery to substantially exceed annual catch limits designed to prevent overfishing and will delay the rebuilding of the red snapper population.

5.     Further, the Fisheries Service failed to conduct any environmental analysis of this consequential action, or allow for public notice and comment, even though the rule upends established management requirements for the fishery. Instead, the Fisheries Service disregarded its obligations to follow the National Environmental Policy Act ("NEPA"), the Magnuson-Stevens Act, and the Administrative Procedure Act ("APA") when issuing the Temporary Rule.

6. As a result of the defects in the Temporary Rule and the overfishing it will cause, the associated lack of NEPA analysis, and the Service's failure to allow for public participation, the Temporary Rule violates the Magnuson-Stevens Act, NEPA, and the APA in a manner that harms Plaintiffs' interests in a healthy population of red snapper and in protecting and restoring the species' role in maintaining a balanced, healthy ecosystem. This harm is occurring in 2017 and will continue to occur without action by this Court.

7. Plaintiffs request that this matter be advanced for hearing at the earliest opportunity pursuant to 16 U.S.C. § 1855(f)(4) and will move accordingly.

## PARTIES

8. Plaintiff Ocean Conservancy is a non-profit, science-based conservation organization dedicated to healthy oceans and the wildlife and communities that depend on them. Since 1972, Ocean Conservancy has sought to improve the health of our nation's marine wildlife and fish. To that end, and as part of its organizational goals, Ocean Conservancy seeks to prevent degradation of marine habitats and end overfishing—catching more fish than the remaining population can replace. Ocean Conservancy aims to help restore and sustain fisheries by restoring depleted fish populations and supporting sustainable long-term management. Ocean Conservancy has over 125,000 members and supporters worldwide, including over 14,000 in the five Gulf of Mexico states. In the 1990s, Ocean Conservancy became involved in the red snapper fishery. For the past three decades, Ocean Conservancy has worked to promote a healthy red snapper fishery for the benefit of the Gulf of Mexico's ecosystem and coastal communities. Ocean Conservancy staff has regularly attended meetings of the Gulf of Mexico Fishery Management Council and has been involved in public awareness events concerning fisheries

management. Ocean Conservancy's headquarters are located in Washington, D.C. It also has offices in Alaska, California, Florida, Louisiana, Oregon, and Texas.

9.      Plaintiff Environmental Defense Fund ("EDF") is a leading national non-profit organization representing more than 400,000 members, including over 40,000 members in the five states bordering the Gulf of Mexico. Since 1967, EDF has linked science, economics, law and innovative private-sector partnerships to create breakthrough solutions to the most serious environmental problems. In particular, EDF has been a leader in advocating innovative approaches to management that align conservation and economic goals in commercial and recreational fisheries, including over two decades of work in the Gulf of Mexico red snapper fishery. EDF staff regularly meet with anglers who fish in the Gulf of Mexico, attend meetings of the Gulf of Mexico Fishery Management Council concerning recreational issues, and submit comments on actions under consideration by the Council concerning recreational matters. EDF has members who are interested in the conservation of reef fish species, including red snapper, in the Gulf of Mexico. These members include wildlife enthusiasts, recreational anglers, restaurateurs, fish suppliers, scientists and others who receive aesthetic, recreational, commercial, scientific, and educational benefits from Gulf of Mexico reef fish species including red snapper.

10.      Plaintiffs' members observe and interact with red snapper and their habitat in the Gulf Region for both recreational and commercial purposes, including fishing for, selling, and eating red snapper. Furthermore, healthy and sustainable fisheries management is crucial to marine ecosystem health. In order for Plaintiffs' members to engage in these activities and obtain their overall organizational goals of healthy fisheries, the Fisheries Service must comply with its legal obligations to rebuild red snapper in the Gulf of Mexico. Consequently, Plaintiffs' members

are directly affected by the Fisheries Service's decision to extend the fishing season for private

anglers by 39 days, thereby "substantially exceed[ing the] annual catch limit, which was designed

to prevent overfishing," 82 Fed. Reg. at 27,779, and thwarting efforts by the Plaintiffs and others

to rebuild the population.

11.     Plaintiffs' members suffer direct and immediate injury caused by the Fisheries

Service's new regulation that not only promotes overfishing, but also substantially delays

rebuilding of the red snapper population. Plaintiffs' members plan to continue their fishing of and

interactions with red snapper, but their activities are impaired by the Fisheries Service's repeated

failure to effectively limit the number of red snapper caught each year, including in 2017. Unless

the Court grants the relief requested, the Fisheries Service's failure to fulfill its obligations will

continue to harm Plaintiffs' members. The Fisheries Service's actions are unlawful and arbitrary,

in violation of the Magnuson-Stevens Act, NEPA, and the APA, and are causing irreparable

injury to Plaintiffs for which they have no other adequate remedy at law. The Temporary Rule is

an action that is capable of repetition, but evading judicial review.

12.     Defendant Wilbur L. Ross is Secretary of the United States Department of

Commerce ("Secretary"). He is sued in his official capacity as the chief officer of the department

charged with overseeing the proper administration and implementation of the Magnuson-Stevens

Act, including provisions of that Act that require implementation of annual catch limits,

accountability measures, and others actions necessary to end overfishing and rebuild overfished

populations of fish, as well as other applicable law, including NEPA.

13.     Defendant National Oceanic and Atmospheric Administration ("NOAA") is an

agency of the United States Department of Commerce with supervisory responsibility for the

Fisheries Service. The Secretary has delegated responsibility to implement and enforce

compliance with the Magnuson-Stevens Act and other applicable law to NOAA, which in turn has

sub-delegated that responsibility to the Fisheries Service.

14.     Defendant National Marine Fisheries Service is an agency of the United States

Department of Commerce that has been delegated the responsibility to implement and enforce

FMPs and amendments to those plans, and to issue implementing regulations. The Fisheries

Service is the United States government agency with primary responsibility to ensure that the

requirements of the Magnuson-Stevens Act are followed and enforced, including the requirements

to implement annual catch limits, accountability measures, and other actions necessary to end

overfishing and rebuild overfished populations of fish.

## JURISDICTION AND VENUE

15.     This action arises under the Magnuson-Stevens Act, 16 U.S.C. §§ 1801-1891d,

NEPA, 42 U.S.C. §§ 4321-4370, and the APA, 5 U.S.C. §§ 701-706.

16.     This Court has jurisdiction over this action pursuant to the Magnuson-Stevens

Act, which provides that "[t]he district courts of the United States shall have exclusive

jurisdiction over any case or controversy arising under" the Magnuson-Stevens Act. 16 U.S.C. §

1861(d). The Magnuson-Stevens Act also provides that actions taken by the Secretary of

Commerce under regulations implementing an FMP shall be subject to judicial review "if a

petition for such review is filed within 30 days after the date on which the regulations are

promulgated or the action is published in the Federal Register, as applicable." 16 U.S.C. §

1855(f). Defendants published this Temporary Rule on June 19, 2017, in the Federal Register. 82

Fed. Reg. at 27,777. Plaintiffs are filing this Complaint within 30 days of publication of the

Temporary Rule.

17.     This Court further has jurisdiction over this action pursuant to the APA, 5 U.S.C.

§§ 701-706, which provides that final agency action for which there is no other remedy in a court is subject to judicial review; 28 U.S.C. § 1331 (federal question jurisdiction), which grants the district courts "original jurisdiction of all civil actions arising under the . . . laws . . . of the United States;" and 28 U.S.C. § 1361, which grants the district courts "original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."

18.     This Court has the authority to grant declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, and may grant relief pursuant to the Magnuson-Stevens Act, 16 U.S.C. § 1861(d) and 1855(f), as well as the APA, 5 U.S.C. § 706. An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a).

19.     Venue is properly vested in this judicial district under 28 U.S.C. § 1391(b), (e), where the Defendants are officers or employees of the United States and reside in this district, a substantial part of the events and omissions which gave rise to this action occurred in this district, and Plaintiffs reside in this district.

## LEGAL BACKGROUND

### Magnuson-Stevens Act

20.     The Magnuson-Stevens Act was enacted to conserve and manage fish populations in the United States' exclusive economic zone ("EEZ"), which extends from the boundaries of state waters to 200 miles offshore or to an international boundary with neighboring countries. 16 U.S.C. § 1801(b)(1); *see also* 16 U.S.C. § 1856(a)-(b). For purposes of managing red snapper in the Gulf of Mexico, state waters extend nine miles from shore. H.R. 2029, Consolidated Appropriations Act 2016, Div. B, General Provisions, Dept. of Commerce, Section 110(b).

21.     The Magnuson-Stevens Act establishes a system for fisheries conservation and management that divides authority between the Fisheries Service and eight regional fishery management councils. 16 U.S.C. § 1852(a)(1)(A)–(H).

22.     The Gulf of Mexico Regional Fishery Management Council ("Gulf Council") oversees the red snapper fishery in the Gulf of Mexico seaward of "the States of Texas, Louisiana, Mississippi, Alabama, and Florida." 16 U.S.C. § 1852(a)(1)(E).

23.     Under the Magnuson-Stevens Act, regional councils have the initial responsibility for developing FMPs and FMP amendments for each fishery "that requires conservation and management" within the councils' respective geographic area of authority. 16 U.S.C. § 1852(h)(1).

24.     The Magnuson-Stevens Act requires that FMPs, FMP amendments, and any regulations promulgated to implement such FMPs, be consistent with the "national standards" for fishery conservation and management, and certain other requirements. 16 U.S.C. §§ 1851(a), 1853(a).

25.     National Standard 1 requires that "[c]onservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery." 16 U.S.C. § 1851(a)(1). National Standard 2 requires that "[c]onservation and management measures shall be based upon the best scientific information available." 16 U.S.C. § 1851(a)(2).

26.     The Magnuson-Stevens Act requires that FMPs "contain the conservation and management measures . . . necessary and appropriate for the conservation and management of the fishery, to prevent overfishing and rebuild overfished stocks, and to protect, restore, and promote the long-term health and stability of the fishery." 16 U.S.C. § 1853(a)(1)(A). For an overfished

population, an FMP must "contain conservation and management measures to prevent overfishing or end overfishing and rebuild the fishery." 16 U.S.C. § 1853(a)(10).

27.     The Magnuson-Stevens Act requires that any FMP shall "establish a mechanism for specifying annual catch limits" for every fishery "at a level such that overfishing does not occur in the fishery, including measures to ensure accountability" if catch exceeds those limits. 16 U.S.C. § 1853(a)(15).

28.     Pursuant to the Magnuson-Stevens Act, 16 U.S.C. § 1851(b), the Fisheries Service has promulgated guidelines for implementing the National Standards for fishery conservation and management measures. The guidelines reflect the Fisheries Service's interpretation of the National Standards. 50 C.F.R. § 600.305(a)(3).

29.     The National Standard 1 Guidelines define "annual catch limit" as "a limit on the total annual catch of a stock or stock complex . . . that serves as the basis for invoking [accountability measures]." 50 C.F.R. § 600.310(f)(1)(iii).

30.     Accountability measures are defined as "management controls to prevent [annual catch limits] . . . from being exceeded, and to correct or mitigate any overages of the [annual catch limit] if they occur . . . in as short a time as possible." 50 C.F.R. § 600.310(g)(1).

31.     These requirements work together to ensure that "[annual catch limits] in coordination with [accountability measures] must prevent overfishing." 50 C.F.R. § 600.310(f)(4)(i). "The system of [annual catch limits] and [accountability measures] . . . must be effective in protecting the stock or stock complex as a whole." 50 C.F.R. § 600.310(f)(4)(ii).

32.     In order to meet these requirements, FMPs can use accountability measures that can include an annual catch target and closure of a fishery. The agency defines "annual catch target" as "an amount of annual catch of a stock or stock complex that is the management target

of the fishery, and accounts for management uncertainty in controlling the catch at or below the [annual catch limit]." 50 C.F.R. § 600.310(g)(4).

33.     The guidelines also state "FMPs should contain in-season closure authority giving [the Fisheries Service] the ability to close fisheries if it determines, based on data that it deems sufficiently reliable, that an [annual catch limit] has been exceeded or is projected to be reached, and that closure of the fishery is necessary to prevent overfishing." 50 C.F.R. § 600.310(g)(2).

34.     Within two years of a stock being declared overfished, the appropriate regional council must prepare and implement an FMP, FMP amendment, or regulations to rebuild the stock. 16 U.S.C. § 1854(e)(3)(A). These rebuilding measures must specify a time for rebuilding the stock that is "as short as possible" and may not exceed 10 years, unless, *inter alia*, the biology of the stock or other environmental conditions will not allow rebuilding within 10 years. 16 U.S.C. § 1854(e)(4)(A)(i).

35.     After developing FMPs, FMP amendments, and implementing regulations, regional councils submit them to the Fisheries Service for final approval. *See* 16 U.S.C. § 1854(a), (b). The Fisheries Service must "approve, disapprove, or partially approve a plan or amendment" proposed by a regional council and must evaluate proposed regulations to determine whether they are consistent with the relevant FMP or FMP amendment. 16 U.S.C. § 1854(a)(3), (b)(1).

36.     If disapproving or partially approving a plan or amendment, or disapproving a regulation, the Fisheries Service must notify the regional council regarding legal inconsistencies caused by the plan, amendment, or regulation; "the nature of such inconsistencies;" and recommendations on how to improve the plan, amendment, or regulation in a way that would bring it into compliance with the law. 16 U.S.C. § 1854(a)(3)(A)–(C), (b)(1). In other words, the

Fisheries Service may not rewrite FMPs or implementing regulations for policy reasons; the

Magnuson-Stevens Act authorizes disapproval, full or partial, only if the FMP, amendment, or

proposed regulation is inconsistent with the Magnuson-Stevens Act or another law.

37.     The Fisheries Service has the responsibility to implement FMPs and FMP

amendments, and may promulgate such regulations, pursuant to APA rulemaking procedures, as

may be necessary to do so. 16 U.S.C. § 1855(d).

38.     In accordance with this statutory structure, the Gulf Council first developed an

FMP that governs the Gulf of Mexico red snapper fishery, known as the Gulf of Mexico Reef

Fish Fishery Management Plan ("Reef Fish FMP"), in 1984. Since then, it has made numerous

amendments to that FMP and implementing regulations, 50 C.F.R § part 622, which were

approved by the Fisheries Service pursuant to 16 U.S.C. § 1854(a), (b).

39.     Congress included a specific provision in the Magnuson-Stevens Act that governs

the management of the red snapper fishery. Magnuson-Stevens Act section 407(d) requires

separate "quotas" for the recreational and commercial sectors of the red snapper fishery. 16

U.S.C. § 1883(d)(1). This provision requires that once the recreational fishery for red snapper

reaches its quota, recreational fishing must cease. 16 U.S.C. § 1883(d)(1).

40.     The regulations promulgated to implement the FMP for red snapper establish the

quotas for the commercial and recreational red snapper sectors and set the annual catch limit for

the recreational sector equal to the quota. 50 C.F.R. §§ 622.39(a)(2)(i)(A); 622.41(q)(2)(i) ("The

recreational [annual catch limit] is equal to the total recreational quota.").[1]

---

[1] The Fisheries Service often uses the terms "quota" and "annual catch limit" interchangeably.
The Reef Fish FMP refers to the total catch limit set for the entire red snapper fishery as an
"annual catch limit." Fishery management documents refer to limits set for both the recreational
sector and the commercial sector as "annual catch limits" or "quotas;" the terms are equivalent in

41.     The total annual catch limit for the red snapper fishery in 2017, including both the recreational and commercial sectors, is 13.74 million pounds. The annual catch limit for the recreational sector for fishing year 2017 and subsequent fishing years is 6.733 million pounds. 50 C.F.R. § 622.39(a)(2)(i)(A). The annual catch limit for the recreational sector applies for the entire fishing year, and the regulations allow increases only if the total allowable catch was not exceeded in the previous fishing year. The annual catch limits "include species harvested from state waters adjoining the EEZ." 50 C.F.R. § 622.8(a).

42.     The regulations also divide the recreational sector into two components, a charter component and a private angling component, and allocate separate quotas for each component from the total recreational annual catch limit. 50 C.F.R. §§ 622.39(a)(2)(i)(B), (C); 622.41(q)(2)(3).

43.     In addition, the regulations establish an annual catch target for the total recreational sector at 5.386 million pounds, which reflects annual catch targets of 2.278 million pounds for the charter component and 3.108 million pounds for the private angling component; the regulations require that fishing by each fishery component cease when the applicable target is reached. 50 C.F.R. § 622.41(q)(iii).

44.     The regulations require the Fisheries Service to close a Gulf reef fish fishery when an annual catch limit is reached or projected to be reached. 50 C.F.R. § 622.8(b). In the case of the red snapper fishery, the regulations require the Fisheries Service to determine the length of the red snapper recreational fishing season "based on when recreational landings are projected to

---

that context. Finally, management documents refer to catch limits for each component of the recreational sector as "quotas." For sake of consistency and clarity, we use the term "annual catch limit" to refer to limits set for the recreational red snapper sector, and "quota" to refer to limits set for the components of the recreational sector (charter and private angler).

reach the recreational [annual catch target of 5.386 million pounds], or respective recreational component [annual catch targets]." 50 C.F.R. § 622.41(q)(2)(i), (iii). These measures serve as "in-season accountability measures" for the fishery. 50 C.F.R. § 622.41(q)(2)(i).

45. Once the recreational red snapper fishery is closed, the regulations require that the Fisheries Service set the bag and possession limit for the respective component at zero and prohibit additional harvest or possession of red snapper. 50 C.F.R. §§ 622.41(q)(2)(i); 622.39(c).

46. The regulations permit the Fisheries Service to reopen the red snapper fishery after it is closed only if "subsequent data indicate that the quota or [annual catch limit] was not reached." 50 C.F.R. § 622.8(c).

47. If red snapper recreational landings exceed the annual catch limit for the recreational sector, the regulations require the Fisheries Service to reduce the recreational annual catch limit by the amount of the overage in the prior fishing year, reduce the applicable recreational component quota(s), and reduce the applicable component annual catch target unless the Fisheries Service determines, based upon the best available science, "that a greater, lesser, or no overage adjustment is necessary." 50 C.F.R. § 622.41(q)(2)(ii).

48. The red snapper regulations allow the Fisheries Service to adjust management measures, including closed seasons and reopenings, annual catch limits, quotas, annual catch targets, and accountability measures if they do so "[i]n accordance with the framework procedures" of the Reef Fish FMP. 50 C.F.R. § 622.42.

49. The Magnuson-Stevens Act requires that the public be given notice and opportunity to comment in writing or through public hearings throughout the fishery management process, including: (1) when the Fisheries Service prepares an FMP, (2) when the Council prepares an FMP, and (3) when regulations or amendments are proposed (by either the Fisheries

Service or the Council). 16 U.S.C. §§ 1852(h)(3); 1854(a)(1)(B), (b)(1)(A), (c)(2)(A), (c)(4)(B),

(c)(6). These public notice and comment periods range from 15-60 days, depending on the nature

of the measure being promulgated. *See* 16 U.S.C. § 1854(a)(1)(B), (b)(1)(A), (c)(6).

50.     Furthermore, the Magnuson-Stevens Act requires the Fisheries Service to adhere

to notice and comment requirements of the APA when promulgating regulations to carry out the

Magnuson-Stevens Act. 16 U.S.C. § 1855(d).

## National Environmental Policy Act

51.     The National Environmental Policy Act is our "basic national charter for

protection of the environment." 40 C.F.R. § 1500.1(a). NEPA requires federal agencies to

evaluate prospectively the environmental impacts of proposed actions that they carry out, fund, or

authorize and to ensure that the public is given a meaningful opportunity to participate in the

decision-making process. 40 C.F.R. § 1502.1.

52.     NEPA requires federal agencies to prepare an environmental impact statement

("EIS") for all "major Federal actions significantly affecting the quality of the human

environment." 42 U.S.C. § 4332(C); 40 C.F.R. § 1501.4. Under certain circumstances, the agency

can prepare an environmental assessment that provides "sufficient evidence and analysis for

determining whether to prepare" an EIS and that contributes to the agency's compliance with

NEPA. 40 C.F.R. §§ 1508.9, 1501.4.

## Administrative Procedure Act

53.     The Administrative Procedure Act grants a right of judicial review to "[a] person

suffering legal wrong because of agency action, or adversely affected or aggrieved by agency

action." 5 U.S.C. § 702.

54.     Under the APA, a court must "hold unlawful and set aside agency action . . .

found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law." 5 U.S.C. § 706(2)(A). An agency action is "arbitrary and capricious if the agency has relied

on factors which Congress has not intended it to consider, entirely failed to consider an important

aspect of the problem, offered an explanation for its decision that runs counter to the evidence

before the agency, or is so implausible that it could not be ascribed to a difference in view or the

product of agency expertise." *Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co*., 463

U.S. 29, 43 (1983).

55.     Under the APA, a court must also "hold unlawful and set aside" any agency

action taken that is "in excess of statutory jurisdiction, authority, or limitations, or short of

statutory right." 5 U.S.C. § 706(2)(C).

56.     The APA also requires that an agency "give interested persons an opportunity to

participate in the rule making through submission of written data, views, or arguments with or

without opportunity for oral presentation" after affording the public with notice via publication in

the Federal Register. 5 U.S.C. § 553(c).

57.     An agency may issue a "[g]eneral notice of proposed rule making" in the Federal

Register without providing an opportunity for public comment only if it can demonstrate good

cause. 5 U.S.C. § 553(b). The agency must be able to show that allowing for public participation

is "impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(3)(B).

Furthermore, these findings of good cause must be incorporated in the rule, with "a brief

statement of reasons therefor." 5 U.S.C. § 553(b)(3)(B).

58.     The 30-day waiting period required under the APA before implementation of a

new rule may also be disregarded only if the new rule (1) "grants or recognizes an exemption or

relieves a restriction;" (2) is an "interpretive rule and statement of policy;" or (3) if an agency

again can provide "good cause" and publishes that reasoning in the rule. 5 U.S.C. § 553(d)(1)–(3).

## FACTUAL BACKGROUND

59.     Red snapper (*Lutjanus campechanus*) is distributed along the Atlantic coast from

North Carolina southward and throughout the Gulf of Mexico and Caribbean. Red snapper can

live for over fifty years; older adults have significantly more reproductive potential than younger

ones. Most red snapper caught in the Gulf of Mexico are less than ten years old.

60.     The red snapper fishery in the Gulf of Mexico began in the 1840s off the coast of

Pensacola, Florida. After World War II, technological advances in fishing equipment and boats

helped drive the expansion of the commercial fleet. As a result, commercial landings of red

snapper increased dramatically from about three million pounds in 1950 to seven million pounds

in 1960.

61.     During this time, recreational fishing grew in popularity as tourism boomed.

Between 1950 and 1990, recreational catch of red snapper was estimated to grow from less than

500,000 pounds per year to five million pounds per year. During this same period, a growing Gulf

shrimp fishery increased catches of shrimp and, consequently, increased bycatch of juvenile red

snapper which are caught incidentally by the shrimp fishery.

62.     As a result, red snapper numbers in the Gulf of Mexico declined dramatically

from the 1960s to the late 1980s.

63.     Federal management of the red snapper fishery under the Magnuson-Stevens Act

began in 1984 when the Fisheries Service implemented the Reef Fish FMP, which included red

snapper. In 1988, the Fisheries Service concluded that red snapper was both overfished

(population abundance was too low) and that it was undergoing overfishing (rate at which fish were removed from the water by fishing was too high).

64.     In order to reverse this trend, the Gulf Council adopted Amendment 1 to the Reef Fish FMP in 1990, which specified a framework for setting total allowable catch (later termed the annual catch limit) and allotted the commercial sector 51 percent of the catch and the recreational sector 49 percent. In 2014, Amendment 40 to the FMP further subdivided the recreational sector's allocation, apportioning 42.3 percent of the recreational annual catch limit to a charter/for-hire component (which takes paying customers out to fish) and 57.7 percent to a private recreational angling component (who use their own boats).

65.     Six additional stock assessments in the 1990s and another in 2005 all found that red snapper was still overfished and undergoing overfishing. Despite these negative findings, during this period federal managers failed to set catch levels based on the advice of their scientists.

66.     In 2004, the Fisheries Service approved Amendment 22 to the Reef Fish FMP, which established a rebuilding plan for red snapper that was projected to end overfishing by 2010 and to rebuild the stock by 2032. In 2005, Plaintiff Ocean Conservancy challenged the rebuilding plan for red snapper, alleging the rebuilding plan was insufficient to end overfishing and rebuild red snapper. The court agreed, holding that the plan failed to end overfishing, quickly rebuild red snapper populations, and minimize bycatch as the Magnuson-Stevens Act required. *Coastal Conservation Ass'n v. Gutierrez*, 512 F. Supp. 2d 896 (S.D. Tex. 2007). The court ordered the agency to implement a new, legally sufficient rebuilding plan, which was finalized in February 2008 through Amendment 27 to the Reef Fish FMP.

67.    In 2012, NMFS determined that the red snapper stock was no longer subject to overfishing. Although the overfishing of the red snapper stock had ended, the stock was still overfished and rebuilding, and the population was not expected to reach its rebuilding target until 2032.

68.    While the commercial sector has stayed within its annual catch limit since the implementation of individual fishing quotas in 2007, the recreational sector has routinely exceeded its annual catch limit. The recreational sector exceeded its limit every year between 2007 and 2013 but one, 2010, when the Deepwater Horizon oil spill disaster shut down large portions of the Gulf of Mexico to recreational fishing. In 17 of the last 22 years, the recreational sector has exceeded its catch limits.

69.    In 2013, a group of Gulf of Mexico commercial red snapper fishermen challenged the management leading to persistent exceedances ("overages") by the recreational sector. In 2014, Judge Rothstein of this Court ruled in favor of the Plaintiffs, holding that the overages violated multiple provisions of the Magnuson-Stevens Act. *Guindon v. Pritzker*, 31 F. Supp. 3d 169 (D.D.C. 2014).

70.    As a result, the Gulf Council developed, and the Fisheries Service approved, accountability measures aimed at preventing the recreational fishery from exceeding its annual catch limit, including an annual catch target set 20 percent below the annual catch limit (a "buffer") and a payback provision requiring overages from one season to be subtracted from the annual catch limit of the subsequent season. *See* 80 Fed. Reg. 14,328, 14,328 (Mar. 19, 2015); *see also* 79 Fed. Reg. 27,768, 27,769 (May 15, 2014).

71.    The accountability measures led to 2014 being the first year that the recreational fishery stayed within its annual catch limit since 1996 (excluding 2010, the year of the BP

Horizon Spill, and 2006, the year of Hurricane Katrina). However, the 2014 season was only nine days long.

72.     Traditionally, many states would set their state recreational fishing seasons to coincide with the federal recreational fishing season. However, as the federal season has shrunk, states have responded by setting longer fishing seasons in state waters that are inconsistent with the federal season. Florida, for example, set a 78-day state water season in 2017. Red snapper are federally managed as a Gulf-wide stock and federal managers must reduce the federal fishing season to account for fish taken in state waters. Thus, the longer the state seasons are, the higher state landings will be, resulting in shrinking federal seasons.

73.     In 2016, legislation providing appropriations for the Fisheries Service included language extending Alabama, Mississippi, and Louisiana's three nautical mile territorial boundaries out to nine nautical miles for the purposes of red snapper management, making them consistent with the state water boundaries in the Gulf of Mexico of Florida and Texas. H.R. 2029, Consolidated Appropriations Act 2016, Division B, General Provisions, Department of Commerce, Section 110(b). Partly as a result, state water landings increased. Private recreational anglers exceeded their 2016 annual catch limit by 1,037,901 pounds, or 25 percent. The 20 percent buffer was not sufficient to prevent an overage in 2016.

74.     In part as a result of the 2016 overage, federal managers set the 2017 federal recreational season for the private angling component at three days, which closed the season for the private angling component on June 4, 2017. 82 Fed. Reg. 21,140 (May 5, 2017). The Fisheries Service estimated that 81 percent of the recreational annual catch limit would be caught in state waters. The Fisheries Service stated that it was necessary to limit the federal recreational season for the private recreational component to three days in order to compensate for the 2016 overage

and that season lengths were set "to reduce the likelihood of harvests' exceeding the component

quotas and the total recreational [annual catch limit]." 82 Fed. Reg. at 21,141 (citing 50 C.F.R.

§ 622.41(q)(2)).

### *The Temporary Rule Reopening the Private Angler Season*

75.     On June 14, 2017, the Fisheries Service announced a Temporary Rule under

which the private recreational season would be reopened for long weekends throughout the

summer, as follows: "The Federal recreational season for red snapper in the Gulf EEZ re-opens at

12:01 a.m., local time, on June 16, 2017. For recreational harvest by the private angling

component, from June 16, 2017, through Labor Day, September 4, 2017, the season will be closed

Monday through Thursday with the exception of July 3, July 4, and September 4." 82 Fed. Reg. at

27,777.

76.     Under the Temporary Rule, recreational fishing for the private recreational

component occurs Fridays, Saturdays, and Sundays beginning Friday, June 16, until Sunday,

September 3, plus the addition of three days corresponding to holidays—July 3 and 4 and

September 4. 82 Fed. Reg. at 27,778. This administrative action adds 39 additional fishing days to

what was previously a three-day federal season, for a total of 42 days. 82 Fed. Reg. at 27,779.

77.     The announcement of the reopening was made via a media release and a pre-

publication public inspection notice issued on Wednesday, June 14, which stated that the season

would re-open on Friday, June 16. However, the rule was not published in the Federal Register

until Monday, June 19, 2017. As a result, the announcements of June 14 purportedly opened the

season on the Friday, Saturday, and Sunday (June 16-18) prior to publication in the Federal

Register.

78.     The Fisheries Service did not provide any opportunity for public comment on the

Temporary Rule and waived the 30-day delay in effectiveness of the action for two reasons. 82

Fed. Reg. at 27,779.

79.     First, it claims that "[s]uch procedures are unnecessary because the rule

implementing the requirement to close the recreational components have already been subject to

notice and comment, and all that remains is to notify the public of the closures." 82 Fed. Reg. at

27,779.

80.     Second, the Fisheries Service states that "[p]roviding prior notice and opportunity

for public comment are contrary to the public interest because of the need for timely re-opening of

the Federal private angling component season. In addition, prior notice and opportunity for public

comment would require time and many of those affected by the length of the recreational fishing

season, particularly vacationing private anglers and associated businesses that are dependent on

private anglers, need as much advance notice as [the Fisheries Service] is able to provide to adjust

their personal and business plans to account for the recreational fishing season." 82 Fed. Reg. at

27,779.

81.     The Temporary Rule states that the action will cause the private recreational

sector to substantially exceed its science-based annual catch limit and result in an extension of the

time it will take Gulf of Mexico red snapper to rebuild. 82 Fed. Reg. at 27,779 ("Both the States

and the Federal government understand what is at risk with this approach. The stock is still

overfished. While the stock is ahead of its rebuilding target, if employed even for a short period of

time, this approach may delay the ultimate rebuilding of the stock by as many as 6 years . . .

Similarly, the approach will necessarily mean that the private recreational sector will substantially

exceed its annual catch limit, which was designed to prevent overfishing the stock.").

82.     The Fisheries Service did not perform any analysis of the Temporary Rule's environmental impacts pursuant to NEPA.

83.     The Temporary Rule to re-open the season refers to an "agreement" between the Secretary of Commerce and the five Gulf States whereby in exchange for additional days for private anglers to fish in federal waters the states will prohibit fishing in state waters during the weekdays and curtail state seasons in the fall. 82 Fed. Reg. at 27,779. Although the states have committed to limit their summer seasons to Fridays, Saturdays, and Sundays, only two of the five states (Florida and Alabama) committed to forego fall seasons. The Temporary Rule states that Mississippi and Louisiana have "committed to reviewing their fall seasons . . . and may decide not to allow fall fishing" and Texas "expects to remain open." 82 Fed. Reg. at 27,779 (emphasis added). In short, only two of the five states have actually agreed to make their fishing seasons fully consistent with the new federal season.

84.     The Temporary Rule does not purport to adjust the annual catch limit, nor does it include a numerical estimate of how many additional pounds of red snapper will be landed by the private angler component. While the Temporary Rule states that it "may delay the ultimate rebuilding of the stock by as many as 6 years," 82 Fed. Reg. at 27,779, it does not include any data or analysis underlying that statement for public review.

85.     Upon information and belief, Plaintiffs estimate that the Temporary Rule will result in the private angling component exceeding its quota by between 6.8 and 9.6 million pounds, allowing the private angling component to catch between 282% and 356% of its quota.

86.     The Temporary Rule will allow increased fishing and will result in catch in excess of the private angler component annual catch target.

87.     The Temporary Rule will result in catch in excess of the private angler component quota.

88.     The Temporary Rule will result in catch in excess of the recreational sector annual catch target.

89.     The Temporary Rule will result in catch in excess of the recreational sector annual catch limit.

90.     The Temporary Rule will result in catch in excess of the total red snapper annual catch limit.

91.     The Temporary Rule will result in catch in excess of the total red snapper allowable biological catch.

92.     The Temporary Rule will result in catch in excess of the total red snapper overfishing limit.

93.     The Temporary Rule will cause overfishing of the Gulf of Mexico red snapper stock.

## CAUSES OF ACTION

## COUNT I: THE FISHERIES SERVICE VIOLATED ITS DUTY TO PREVENT OVERFISHING IN VIOLATION OF THE MAGNUSON-STEVENS ACT AND THE APA

94.     Plaintiffs reallege and incorporate by reference paragraphs 1 through 93 of the Complaint in this First Cause of Action.

95.     National Standard 1 of the Magnuson-Stevens Act requires that "[c]onservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery." 16 U.S.C. § 1851(a)(1).

96.     The Fisheries Service admits that its Temporary Rule will cause the "private recreational sector" of the red snapper fishery to exceed its annual catch limit, which is set at a

level that is designed to avoid overfishing. 82 Fed. Reg. at 27,779 ("[T]he approach will

necessarily mean that the private recreational sector will substantially exceed its annual catch

limit, which was designed to prevent overfishing the stock.").

97.     By authorizing the fishery to exceed an annual catch limit that is designed to

prevent overfishing, the Temporary Rule will cause overfishing. The Temporary Rule offers no

assurance whatsoever that the agency's action will avoid overfishing, much less explain how it

could do so.

98.     By promulgating the Temporary Rule, the Fisheries Service has failed to meet the

specific, non-discretionary requirements of the Magnuson-Stevens Act to prevent overfishing, as

required by National Standard 1, 16 U.S.C. § 1851(a)(1), and acted arbitrarily and capriciously, in

violation of the APA, 5 U.S.C. §§ 701-706.

99.     These actions and failures to act by the Defendants are arbitrary and capricious,

violate the Magnuson-Stevens Act, and are causing irreparable injury to the Plaintiffs for which

they have no adequate remedy at law.

## COUNT II: THE TEMPORARY RULE AUTHORIZES CATCH THAT WILL EXCEED ANNUAL CATCH LIMITS CONTRARY TO ACCOUNTABILITY MEASURES IN VIOLATION OF THE MAGNUSON-STEVENS ACT AND THE APA

100.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 99 of the

Complaint in this First Cause of Action.

101.    The Magnuson-Stevens Act authorizes the Fisheries Service to promulgate

regulations that implement and are consistent with existing FMPs. *See* 16 U.S.C. §§

1854(b)(1)(A); 1854(e)(6), (7); 1855(d).

102.    The Act requires the Reef Fish FMP to "establish a mechanism for specifying

annual catch limits" for red snapper "at a level such that overfishing does not occur in the fishery,

including measures to ensure accountability" if catch exceeds those limits. 16 U.S.C. § 1853(a)(15).

103.    Accountability measures must prevent the red snapper recreational and commercial sectors from exceeding the annual catch limit for the red snapper fishery and correct any overages if they occur. 50 C.F.R. § 600.310(g)(1).

104.    Regulations governing the red snapper fishery include accountability measures that set an annual catch target for the recreational sector at 5.386 million pounds, 20 percent less than the annual catch limit for the recreational sector (6.733 million pounds). 50 C.F.R. §§ 622.39; 622.41(q)(2)(iii)(A). The regulations also set annual catch targets for each of the recreational components at 2.278 million pounds for the charter component and 3.108 million pounds for the private angling component. 50 C.F.R. § 622.41(q)(2)(iii)(B), (C).

105.    Regulations establishing accountability measures require the Fisheries Service to set the length of the red snapper recreational fishing season based on when recreational landings are projected to reach the total recreational annual catch target each year or respective recreational component annual catch targets. 50 C.F.R. § 622.41(q)(2)(i). They require the Fisheries Service to close the fishery and prohibit harvest once the annual catch target is met or projected to be met. 50 C.F.R. §§ 622.8(b); 622.41(q)(2)(i); 622.39(c).

106.    The Fisheries Service initially set the 2017 recreational red snapper season for the private angling component to open on June 1, 2017, and close on June 4, 2017, based on the projection of when private angler landings would reach the private angling component annual catch target, as adjusted to account for overages from the 2016 season and taking into account the harvest expected to occur during the state recreational seasons in state waters. 82 Fed. Reg. at 21,140-41.

107. The Temporary Rule that reopened the season for the recreational private angling component will cause the private recreational sector to "substantially exceed its annual catch limit, which was designed to prevent overfishing the stock." 82 Fed. Reg. at 27,779.

108. The Temporary Rule will extend the recreational fishing season for the private angling recreational component beyond the date when the red snapper recreational annual catch target for the private angling component is projected to be reached, in violation of the established in-season accountability measures for red snapper. 82 Fed. Reg. at 27,779.

109. The Temporary Rule also violates regulations that require the Fisheries Service to reduce the recreational annual catch limit by any amount of overage from the prior year by causing the recreational fishery to "substantially exceed" its annual catch limit. 82 Fed. Reg. at 27,779.

110. The Fisheries Service has thus violated specific, non-discretionary requirements of the Magnuson-Stevens Act and implementing regulations that mandate accountability measures to ensure that the annual catch limit will not be exceeded, as required under 16 U.S.C. § 1853(a)(15). The Temporary Rule is also inconsistent with the requirements of the Reef Fish FMP, in violation of the Magnuson-Stevens Act, 16 U.S.C. §§ 1854(b)(1)(A) and 1855(d), and is arbitrary and capricious, in violation of the APA, 5 U.S.C. §§ 701-706.

111. These actions by the Defendants are arbitrary and capricious, violate the Magnuson-Stevens Act, and are causing irreparable injury to Plaintiffs for which they have no adequate remedy at law.

## COUNT III: THE FISHERIES SERVICE VIOLATED ITS DUTY TO PROHIBIT FISHING FOR RED SNAPPER AFTER THE ANNUAL CATCH LIMIT WAS MET IN VIOLATION OF THE MAGNUSON-STEVENS ACT AND GULF OF MEXICO REEF FISH REGULATIONS

112.     Plaintiffs reallege and incorporate by reference paragraphs 1 through 111 of the Complaint in this Third Cause of Action.

113.     Section 407(d) of the Magnuson-Stevens Act requires the Reef Fish FMP to prohibit retention of red snapper caught by the recreational fishing sector for the remainder of the fishing year once that sector has reached its quota or annual catch limit. 16 U.S.C. § 1883(d)(2). The Fisheries Service uses the term "quota" for the recreational sector interchangeably with the term "annual catch limit" for the sector. *See* 50 C.F.R. § 622.41(q)(2)(i). The applicable quota here is the annual catch limit set by the Reef Fish FMP regulations.

114.     Instead of implementing measures that will prevent the recreational fishing sector from retaining red snapper after it met its annual catch limit, as required by section 407(d), the Temporary Rule authorizes fishing that admittedly will cause the private recreational sector to "substantially exceed its annual catch limit," 82 Fed. Reg. 27,779, in direct violation of Section 407(d). 16 U.S.C. § 1883(d).

115.     The Temporary Rule explicitly directs that the private recreational red snapper season will remain open even after the private recreational sector exceeds its annual catch limit. This action violates the Magnuson-Stevens Act, the red snapper regulations implementing the Reef Fish FMP, and the APA. 16 U.S.C. § 1883(d); 50 C.F.R. §§ 622.8(b), 622.41(q)(2)(i); 5 U.S.C. §§ 701-706.

116.     These actions and failures to act by the Defendants are arbitrary and capricious, violate the Magnuson-Stevens Act and the regulations implementing the Reef Fish FMP, and are causing irreparable injury to the Plaintiffs for which they have no adequate remedy at law.

**COUNT IV: THE FISHERIES SERVICE VIOLATED ITS DUTY TO REBUILD THE RED SNAPPER POPULATION IN THE SHORTEST TIME POSSIBLE IN VIOLATION OF THE MAGNUSON-STEVENS ACT AND THE APA**

117.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 116 of the Complaint in this Fourth Cause of Action.

118.    The Magnuson-Stevens Act requires the Gulf Council to prepare and implement rebuilding plans for overfished species to rebuild overfished species. 16 U.S.C. § 1854(e)(4)(A).

119.    These rebuilding plans must specify a time for rebuilding the stock that is "as short as possible" and may not exceed 10 years, unless, *inter alia*, the biology of the stock or other environmental conditions will not allow rebuilding within 10 years. 16 U.S.C. § 1854(e)(4)(A)(i), (ii).

120.    The Fisheries Service declared the Gulf of Mexico red snapper population was overfished in 1988.

121.    The Gulf of Mexico red snapper population remains overfished.

122.    In 2008, the Gulf Council established the rebuilding plan that continues to govern red snapper management, and the Fisheries Service approved that plan as consistent with the rebuilding provisions in 16 U.S.C. § 1854(e) and other applicable law. The plan set a deadline for rebuilding the red snapper population by 2032.

123.    The Fisheries Service estimates that its Temporary Rule will extend the rebuilding time by as many as six years, 82 Fed. Reg. at 27,779, which represents a 40 percent increase in the rebuilding period.

124.    The Temporary Rule will therefore admittedly cause the fishery to miss the Reef Fish FMP's red snapper rebuilding deadline of 2032, which the Gulf Council established and the Fisheries Service itself promulgated. The Temporary Rule thus violates the Magnuson-Stevens

Act, 16 U.S.C. § 1854, the Reef Fish FMP, and is arbitrary and capricious in violation of the APA, 5 U.S.C. §§ 701-706.

125.    These violations of the Magnuson-Stevens Act and APA are causing irreparable injury to Plaintiffs for which they have no adequate remedy at law.

## COUNT V: THE TEMPORARY RULE IS NOT BASED ON THE BEST SCIENTIFIC INFORMATION AVAILABLE IN VIOLATION OF THE MAGNUSON-STEVENS ACT AND THE APA

126.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 125 of the Complaint in this Fifth Cause of Action.

127.    National Standard 2 of the Magnuson-Stevens Act requires the Fisheries Service to base its regulations and actions "upon the best scientific information available." 16 U.S.C. § 1851(a)(2).

128.    The red snapper regulations implementing the Reef Fish FMP require the recreational annual catch limit and annual catch target to be reduced by any overages from the previous year "unless [the Fisheries Service] determines based upon the best scientific information available that a greater, lesser, or no overage adjustment is necessary." 50 C.F.R. § 622.41(q)(2)(ii).

129.    The Fisheries Service issued a rule on May 5, 2017, establishing a three-day season for the private angling component of the recreational red snapper fishery. 82 Fed. Reg. at 21,141. When taking that action, the Fisheries Service stated the action "responds to the best scientific information available." 82 Fed. Reg. at 21,141.

130.    The May 2017 rule established the three-day season based on the Fisheries Service's own calculation of how long it would take the private angling component of the recreational sector to reach its annual catch target. That annual catch target is based on the

Fisheries Service's estimate of how many red snapper may be removed from the population while preventing overfishing, and included a deduction for the sector's significant exceedance of its annual catch limit in 2016. 82 Fed. Reg. at 21,141.

131.    The Temporary Rule "supersedes" the May 2017 rule, 82 Fed. Reg. at 27,777, but offers no analysis to indicate that the annual catch target for the 2017 season was not calculated correctly or has not already been reached. The Fisheries Service offers no scientific basis whatsoever for reopening and extending the season from three to 42 days.

132.    For these reasons, the Fisheries Service's Temporary Rule violates the Magnuson-Stevens Act, 16 U.S.C. §1851(a)(2), and is arbitrary and capricious in violation of the APA, 5 U.S.C. §§ 701-706.

133.    These violations of the Magnuson-Stevens Act and the APA by the Fisheries Service are causing Plaintiffs irreparable injury for which they have no adequate remedy at law.

## COUNT VI: THE FISHERIES SERVICE FAILED TO FOLLOW LAWFUL PROCEDURES IN PROMULGATING THE TEMPORARY RULE IN VIOLATION OF THE MAGNUSON-STEVENS ACT AND THE APA

134.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 133 of the Complaint in this Sixth Cause of Action.

135.    The Magnuson-Stevens Act requires that federal fisheries be managed through FMPs and amendments to those plans. *See, e.g.*, 16 U.S.C. §§ 1801(b)(4), 1852(h)(1). These plans and amendments come with important procedural requirements that ensure the proper conservation and management of each fishery. *See, e.g.*, 16 U.S.C. § 1854(a).

136.    The Magnuson-Stevens Act sets forth specific roles and procedures that federal fishery managers must follow. In the case of red snapper, the Gulf Council has primary responsibility for developing FMP amendments and proposed regulations. The Fisheries Service

has the responsibility to review and approve or disapprove FMPs, FMP amendments, and regulations that the Gulf Council develops to manage the red snapper fishery. 16 U.S.C. § 1854(a), (b).

137.    The Fisheries Service did not follow or invoke the Magnuson-Stevens Act requirements for altering the rebuilding plan for the red snapper fishery. *See* 16 U.S.C. § 1854(e)(1), (5), (7). The Temporary Rule does not purport to alter the rebuilding deadline for red snapper; rather, it notes that the action will cause the rebuilding period to extend as much as six years past the deadline.

138.    Under the red snapper regulations implementing the Reef Fish FMP, the Fisheries Service only has authority to reopen the red snapper fishery if "subsequent data indicate that the quota or [annual catch limit] was not reached." 50 C.F.R. § 622.8(c). The Temporary Rule does not assert that the quota or annual catch limit for the recreational sector had not been reached. To the contrary, the Temporary Rule states that it will cause the private recreational sector to exceed the annual catch limit. 82 Fed. Reg. at 27,779.

139.    The Fisheries Service may modify management measures contained in the Reef Fish FMP in accordance with the Reef Fish FMP Framework Procedures. 50 C.F.R. § 622.42. The Fisheries Service did not use those procedures in developing or promulgating the Temporary Rule.

140.    By using a Temporary Rule to reopen the private angler recreational fishing season and affirmatively allowing the private angling component of the red snapper fishery to substantially exceed the annual catch limit and violate the established rebuilding plan, the Fisheries Service has acted in excess of the authority granted to it by the Magnuson-Stevens Act.

141.    The Temporary Rule is not authorized by any other provision of law.

142.     Because the Fisheries Service lacks authority to rewrite the terms of the Reef Fish

FMP and its implementing regulations through this Temporary Rule, its approval of the rule is

unlawful and arbitrary and capricious in violation of the APA and the Magnuson-Stevens Act.

143.     These violations of the Magnuson-Stevens Act and the APA by the Fisheries

Service are causing Plaintiffs irreparable injury for which they have no adequate remedy at law.

## COUNT VII: THE FISHERIES SERVICE IMPLEMENTED THE TEMPORARY RULE WITHOUT PROVIDING NOTICE AND AN OPPORTUNITY TO BE HEARD IN VIOLATION OF THE MAGNUSON-STEVENS ACT AND THE APA

144.     Plaintiffs reallege and incorporate by reference paragraphs 1 through 143 of the

Complaint in this Seventh Cause of Action.

145.     The Magnuson-Stevens Act requires the Fisheries Service to follow APA notice

and comment procedures when promulgating regulations to carry out an FMP or FMP amendment

or any other provision of the Magnuson-Stevens Act. 16 U.S.C. § 1855(d).

146.     The APA requires federal agencies to provide for public notice and comment on a

proposed rulemaking prior to the agency decision on the proposed rulemaking. 5 U.S.C. § 553(c).

These requirements may only be waived "when the agency for good cause finds . . . that notice

and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5

U.S.C. § 553(b)(B).

147.     The Fisheries Service did not provide notice or an opportunity to comment on the

Temporary Rule before promulgating it.

148.     The Temporary Rule asserts that notice and comment procedures were

"unnecessary and contrary to the public interest." 82 Fed. Reg. at 27,779. It asserts that notice and

comment on the temporary rule *reopening* the fishery were unnecessary because "the rule

implementing the requirement to close the recreational components have [*sic*] already been subject to notice and comment." 82 Fed. Reg. at 27,779.

149.    The Temporary Rule fails to specify the prior closure rule upon which it is relying. To the extent it refers to the rule establishing the three-day private angling season, 82 Fed. Reg. 21,140, it does not apply. The Fisheries Service did not provide for notice and comment on that rule.

150.    Further, closing the private angler fishing season at the conclusion of the scheduled three days and reopening it for 39 days are different agency actions.

151.    To the extent the rule refers to the more general regulations governing how recreational seasons are set for red snapper, the Temporary Rule does not implement those regulations; it is contrary to the requirements set forth in those regulations and to every expectation the public has based on the opportunity to review and comment on those regulations.

152.    Closing the private angler fishing season when it is expected to reach its annual catch target and reopening the season with the express intention to keep it open even after it exceeds its annual catch limit are different agency actions.

153.    The Temporary Rule has a substantial effect on the management of the red snapper fishery. It is wholly inconsistent with the Reef Fish FMP and violates the regulations implementing the FMP. It will cause catch to exceed the annual catch limit and delay the rebuilding plan for the stock by at least six years. 82 Fed. Reg. at 27,778.

154.    The Temporary Rule asserted that notice and comment would be contrary to the public interest because allowing the public to weigh in on a significant departure from red snapper management requirements would reduce the amount of time that private anglers and associated

businesses would have "to adjust their personal and business plans to account for the recreational fishing season." 82 Fed. Reg. at 27,778.

155.     The public interest in commenting on an agency action to allow fishing that will substantially exceed legal limits and delay rebuilding of the red snapper population is at least as significant as the public interest identified in the Temporary Rule.

156.     The reasons advanced in the Temporary Rule are not adequate to meet the APA's "good cause" exception.

157.     By implementing the Temporary Rule without adequate advance public notice and comment, the Fisheries Service violated the Magnuson-Stevens Act and the APA.

158.      These violations of the Magnuson-Stevens Act and the APA by the Fisheries Service are causing Plaintiffs irreparable injury for which they have no adequate remedy at law.

**COUNT VIII: THE FISHERIES SERVICE'S RATIONALE FOR THE TEMPORARY RULE WAS ARBITRARY AND CAPRICIOUS IN VIOLATION OF THE APA AND THE MAGNUSON-STEVENS ACT**

159.      Plaintiffs reallege and incorporate by reference paragraphs 1 through 158 of the Complaint in this Eighth Cause of Action.

160.     Under the APA, an agency action is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43.

161.     In promulgating the Temporary Rule, the Fisheries Service relied on factors Congress did not intend it to consider, offered explanations contrary to the evidence before it, and otherwise failed to offer reasoned, plausible explanations for its action.

162.     For these and other reasons, the Fisheries Service's decision to adopt the

Temporary Rule is arbitrary, capricious, and not in accordance with law. 5 U.S.C. § 706(2)(A).

163.     These violations of the Magnuson-Stevens Act and the APA by the Fisheries

Service are causing Plaintiffs irreparable injury for which they have no adequate remedy at law.

## COUNT IX: THE FISHERIES SERVICE FAILED TO EVALUATE THE ENVIRONMENTAL EFFECTS OF ITS ACTION IN VIOLATION OF NEPA AND THE APA

164.     Plaintiffs reallege and incorporate by reference paragraphs 1 through 163 of the

Complaint in this Ninth Cause of Action.

165.     NEPA requires agencies to complete an environmental impact statement for all

major Federal actions that have a significant impact on the environment. *See* 16 U.S.C. §

4332(C); 40 C.F.R. § 1500.1. Under certain circumstances, agencies can instead prepare an

environmental assessment and make a finding of no significant impact. *See* 40 C.F.R. §§ 1508.13;

1508.9; 1501.4.

166.     The Temporary Rule is a major Federal action.

167.     Despite acknowledging that "[t]he stock is still overfished" and concluding that

reopening the federal recreational red snapper season "will necessarily mean that the private

recreational sector will substantially exceed its annual catch limit, which was designed to prevent

overfishing the stock," 82 Fed. Reg. at 27,779, the Fisheries Service did not perform any analysis

of the Temporary Rule's environmental effects under NEPA.

168.     By failing to analyze the environmental impacts of its action to reopen the private

angling component of the red snapper fishery, the Fisheries Service has acted in a manner that is

arbitrary, capricious, an abuse of discretion, and not in accordance with law, and without

observance of procedures required by law, in violation of NEPA, 42 U.S.C. § 4332, its

implementing regulations, and the APA, 5 U.S.C. §§ 701-706.

169.     These violations of NEPA and the APA by the Fisheries Service are causing

Plaintiffs irreparable injury for which they have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request this Court to enter the following relief:

1.       Declare that the Fisheries Service has violated the Magnuson-Stevens Act, NEPA

and the APA by implementing the Temporary Rule.

2.       Vacate and set aside the Temporary Rule.

3.       Order any and all appropriate injunctive relief.

4.       Maintain jurisdiction over this action until the Fisheries Service is in compliance

with the Magnuson-Stevens Act, NEPA, the APA, and every order of this Court.

5.       Award Plaintiffs their reasonable attorneys' fees and costs pursuant to 28 U.S.C. §

2412; and

6.       Provide Plaintiffs such additional and further relief as may be appropriate.

///

///

DATED: July 17, 2017

Respectfully submitted,

/s/ Roger M. Fleming
Roger M. Fleming (DC Bar No. ME0001)
EARTHJUSTICE
1625 Massachusetts Avenue NW, Suite 702
Washington, DC 20036
202-667-4500 Telephone
202-667-2356 Fax
rfleming@earthjustice.org

Andrea A. Treece (*Pro Hac Vice* pending)
Brettny Hardy (*Pro Hac Vice* pending)
EARTHJUSTICE
50 California St., Suite 500
San Francisco, CA 94111
415-217-2000 Telephone
415-217-2040 Fax
atreece@earthjustice.org
bhardy@earthjustice.org

Christopher D. Eaton (*Pro Hac Vice* pending)
EARTHJUSTICE
705 2nd Ave., Suite 203
Seattle, WA 98104
206-343-7340 Telephone
206-343-1526 Fax
ceaton@earthjustice.org

*Attorneys for Plaintiff Ocean Conservancy*

Michael F. Scanlon (DC Bar # 479777)
Michael.Scanlon@klgates.com
1601 K Street, NW
Washington, DC 20006
Telephone: (202) 661-3764
Facsimile: (202) 778-9100

J. Timothy Hobbs (*Pro Hac Vice* pending)
Tim.Hobbs@klgates.com
925 Fourth Avenue, Suite 2900
Seattle, WA 98104
Telephone: (206) 623-7580
Facsimile:(206) 623-7022

*Attorneys for Plaintiff Environmental Defense Fund*